**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000265
31-OCT-2018
08:10 AM**

NO. CAAP-16-0000265

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellant, v.
PAPAIKANIAU KAIANUI, Defendant-Appellee


APPEAL FROM THE DISTRICT COURT OF THE SECOND CIRCUIT
(CASE NO. 2DTA-15-00730)


MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Reifurth, JJ.)

Plaintiff-Appellant State of Hawai'i (**State**) appeals

from the March 4, 2016 Second Amended Findings of Fact and

Conclusions of Law; Order Granting Motion to Suppress Evidence

(**Order Granting Motion to Suppress**) of the District Court of the

Second Circuit, Wailuku Division (**District Court**).[1]

I.    BACKGROUND

On June 12, 2015, the State filed a Complaint against

Kaianui on the following counts:  Operating a Vehicle Under the

Influence of an Intoxicant in violation of Hawai'i Revised

Statutes (**HRS**) § 291E-61(a)(1)(3), Duty Upon Striking Unattended

Vehicle or Other Property in violation of HRS § 291C-15,

---

[1]    The Honorable Douglas J. Sameshima presided.

Inattention to Driving in violation of HRS § 291-12, Reckless Driving of Vehicle in violation of HRS § 291-2, and Lack of Due Care in violation of Maui County Code § 10.52.010.

On September 18, 2015, Kaianui filed a Motion to Suppress Evidence (**Motion to Suppress**), seeking to suppress "all evidence recovered as the result of the warrantless entry by police into the curtilage of [Kaianui's] home and the warrantless seizure of [Kaianui] therein on May 24, 2015." The Motion to Suppress was based on factual allegations attributed to the police reports of three police officers, which were received from the State. In the motion, Kaianui asserted that a police officer entered the curtilage of her home, with the reason obviously being to obtain information and gather evidence, which exceeds the customary license that members of the public and the police have to enter the curtilage of a home. Thus, Kaianui argued that entry was a search and the State must demonstrate probable cause and an applicable exception to the warrant requirement. In addition, Kaianui argued that she was seized and, absent at least reasonable suspicion for that seizure, it is presumed that the seizure was unreasonable. Kaianui submitted that, as a result of the allegedly unjustified search and seizure, all evidence derived therefrom should be suppressed.

In opposition, the State argued that the officer's approach and contact of Kaianui was a proper temporary investigative detention and, therefore, did not need to be supported by probable cause. The State represented that it would "stand on the testimony presented by its witnesses at the

evidentiary hearing," but stated that a witness had told an officer, Maui Police Department (**MPD**) Officer Kyle Badayos (**Officer Badayos**), that a champagne-colored pickup, matching the description of Kaianui's vehicle,[2] had been involved in a nearby collision and left the scene. The State further argued that because the suspect had left the scene of the collision minutes earlier, exigent circumstances existed, which "allow police contact, even to the point of entry of a defendant's house."

In reply, Kaianui argued, *inter alia*, that the cases relied on by the State involved traffic stops, and not police entering the curtilage of a person's home, that the State failed to address precedent equating the physical intrusion onto the curtilage to gather evidence with a search, and that the State has the burden to prove the applicability of the exigent circumstances exception to the warrant requirement.

The District Court heard testimony on the Motion to Suppress on October 28, 2015. The State called Alexis Felicilda (**Felicilda**), Officer Badayos, and MPD Officer Dennis Arnds (**Officer Arnds**).

Felicilda testified that on the night of May 24, 2015, she and her boyfriend were visiting with friends, Kathy and John Paio, on Eha Street in Wailuku. Felicilda's boyfriend had driven her there and parked her vehicle, a black Toyota pick-up truck, on the street in front of the Paios's home. During her visit,

---

[2] As discussed, *infra*, no testimony supporting this specific description was presented at the evidentiary hearing. The State's opposition also referenced "extensive front damage" to a gold-colored pickup truck seen at Kaianui's residence, but testimony at the evidentiary hearing revealed that this damage was not visible to the officers when they arrived at the home.

Felicilda heard what sounded "like a car accident. Basically a loud screech and then a boom." Within seconds, she and her boyfriend, along with the Paios, exited the home to investigate.

Once outside, Felicilda observed her truck[3] on the curb about 25 feet away from where it had been parked with its entire rear left side smashed in "like an accordion;" and there was a great deal of metal and glass debris, as well as fluid, on the ground near the damaged vehicle. Felicilda saw a truck speeding away, going makai. She testified that she was certain it was a Toyota, because she drives a Toyota, but that she could not make out any other specific features of the vehicle. She could not discern the license plate number or the precise color of the vehicle but only observed that it was "metallic" in color; she could not tell if the color of the truck was light or dark. She was unable to observe who was driving the truck that was speeding away. Immediately thereafter, Mr. Paio got in his vehicle and began following the truck that Felicilda had observed. At that point, Felicilda dialed 9-1-1 and informed them that her truck had been hit, that the responsible vehicle had left the scene, and that her friend was following it.

Officer Badayos testified that, while on patrol in Kahului, he overheard police dispatch assign two other officers, Officer Lago and Officer Arnds, to a motor vehicle collision on Eha Street and decided to report to the scene to assist. Upon arrival, he found Officer Lago on scene and observed a black

---

[3]     Felicilda testified that she had originally purchased the truck in 2005 but that the title is currently in her boyfriend's name. For convenience, it is simply referred to as Felicilda's truck.

pickup truck, partially on the sidewalk with damage to its left rear corner. Officer Badayos obtained a statement from Felicilda's boyfriend and then he conferred with Officer Lago in order to assist with the investigation. Officer Badayos did not testify that he relayed any information to dispatch or anyone other than Officer Lago.[4]

Officer Arnds testified that on the night of May 24, 2015, he was on patrol with another officer, Officer Rodney Haia, and was assigned to investigate a motor vehicle collision on Eha Street. He testified that en route to the scene, Central Dispatch advised him that the responsible vehicle had fled the scene and was in the area of Pohala Street and Kuhio Street. Officer Arnds then proceeded directly to that area.

After investigating Kuhio Street, Officer Arnds proceeded to Pohala Street. He testified on direct examination that, there, at about 10:45 p.m., he "pulled up to a vehicle that [] might have been involved in a crash." He testified that he thought it might have been involved because "[w]hen we looked at the vehicle it was a gold Toyota pickup truck and had heavy front end damage." On cross-examination, however, Officer Arnds admitted that, the truck was parked on a grassy area next to -- adjacent to -- Kaianui's garage, and that from the street, he couldn't see any front end damage. Officer Arnds also observed Kaianui standing out in front of her residence; Officer Arnds later described her location as "kind of in front of the garage

---

[4]     The State did not offer testimony from Officer Lago, Felicida's boyfriend, or either of the Paios.

area."  On re-direct, when asked again what drew his attention to the truck (and what prompted him to approach Kaianui) he stated: "I can't -- we had a witness statement recalling that there was - there was a beige color -- I mean a champagne color Toyota pickup truck.  At that point, I don't recall how we got that information."

Officer Arnds then added:

> I do remember that there was a -- a local, is it a Hawaiian neighbor, standing next to her house pointing at the car.  He was out front.  I didn't get his statement, though, but he was pointing at the car.
>
> It was Kaianui's neighbor was pointing at her truck. That -- that was when we were kind of -- we were already pulling up. . . .
>
> Q.    Okay.
>
> A.    So, the information the other officer had, we were at the house, I don't know.
>                 .  .  .  .
>
> Q.    And so were you -- what roads were you checking on?
>
> A.    Well, Kuhio Street. . . .  And then Pohala Street is right -- is right next, is above, is one of the most northern mauka bound streets. . . . So we made a right on Pohala.  And then, like I said, there was a heavy set local Hawaiian neighbor out pointing at her car.
>
> So I don't know why he was pointing at the car at the time.  No, I don't know why.  He didn't say she was involved in a crash or anything like that.  He just pointed at her car.

On recross-examination, Officer Arnds was asked:

> Q.    Have you seen gold, a gold pickup -- Toyota pickups on this island before?
>
> A.    Yeah.
>
> Q.    More than ten?
>
> A.    Multiple.
>
> Q.    Okay.  Um, did you note the guy -- the guy who was pointing, did you note that in your police report?
>
> A.    No.
>
> Q.    It's something you remembered today?

A.    Yes.

Q.    As you were just testifying on it?

A.    Yes.

No other testimony was offered concerning what information caused Officer Arnds to pull up to Kaianui's residence, exit his vehicle, and then approach and question Kaianui as she stood in front of the home.  Officer Arnds did, however, testify about his encounter with Kaianui.

Q.    After you arrived, what did you do?

A.    I made contact with her.  Stated the reason why I was there.

Q.    Do you recall what you told her as to the reason you were there?

A.    Yeah, we were investigating a traffic crash, and then she stated that she had been involved with a traffic crash and that she had hit a pole and then drove home.

Q.    Did you ask her any questions about her physical condition?

A.    Um, well, I asked her where she'd been coming from.  She said Tropical Plantation she was at a graduation. And I asked her where she was going.  And she said she was driving home.

And then I asked her if she had been drinking.  And she said she had a few drinks at the graduation party at the Tropical Plantation.

And then I asked her why she fled the scene, and she stated that she thought she had hit a pole and then she drove home.

And that point I saw she had red, watery eyes, slurred speech and odor of liquor from her breath.

Q.    When you were speaking to her, where were you speaking to her now?

A.    In front of the -- front of her residence. Front of the driveway area, by the garage.

Q.    And what type of lighting was in that area?

A.    Um, we had our cruiser lights on, headlights from our cruisers.  And our spotlight lighting up the area. But her house is in darkness.

Q.    And what, if anything, did you observe of any injuries on her?

> A.      I asked her if she was injured.  She said she was not injured.  And I didn't observe any injuries.

On cross-examination, Officer Arnds testified that after speaking with Kaianui, Officer Arnds walked up to Kaianui's truck and observed that the front end was damaged:

> Q.      Officer, when -- when you guys -- when you drove up in your patrol vehicle, the car was parked kind of on the grassy area of the yard next to the garage; correct?
>
> A.      Correct.  Adjacent to the garage.
>
> Q.      Right.  And it was pulled in directly straight in?
>
> A.      Correct.
>
> Q.      So from the street you couldn't see any front end damage; correct?
>
> A.      No.  Could not.
>
> Q.      Okay.  And you said she was standing kind of in the driveway?  I'm sorry, I didn't remember what --
>
> A.      She was kind of in front of the garage area. But it was real dark.  But I just remember there was a figure out front.
>
> Q.      Okay.  Did she look -- and I know sometimes you can't tell if somebody looks injured.  But was there any obvious injuries when you first saw her?
>
> A.      There was none.
>
> Q.      Did you ask her to come to the car to see if she could walk and if she had any injuries?
>
> A.      We went to her and I shined my light on her to see if I could see any injuries.
>
> Q.      And was it after that that you went up to go look at the truck?
>
> A.      Yes.
>
> Q.      And that's when you noticed the damage?
>
> A.      Yes.

No further witnesses were heard and the District Court solicited proposed findings of fact and informed the parties that it would issue a written decision.

On January 12, 2016, the District Court entered an order denying the Motion to Suppress. On January 21, 2016, Kaianui filed a Motion for Reconsideration, challenging the clarity and the legal basis for the denial of the Motion to Suppress, and arguing, based on Officer Arnds's testimony, that there was no probable cause justifying the warrantless entry on the curtilage of Kaianui's home and no evidence supporting a reasonable suspicion justifying Kaianui's seizure. In opposition, the State primarily argued that Kaianui's motion failed to meet the criteria for reconsideration.

The District Court heard further argument on January 29, 2016, at which time it indicated it was granting Kaianui's Motion for Reconsideration. On March 4, 2016, the District Court entered the Order Granting Motion to Suppress.[5] The State filed a Notice of Appeal on March 30, 2016.

II. POINTS OF ERROR

The State argues that the District Court erred as a matter of law: (1) when it concluded that Officer Arnds lacked reasonable suspicion to approach Kaianui; and (2) when it concluded that Officer Arnds's contact with Kaianui was unreasonable because he entered the curtilage of Kaianui's home without probable cause.

III. APPLICABLE STANDARDS OF REVIEW

A trial court's ruling on a motion to suppress evidence is reviewed de novo to determine whether the ruling was "right"

---

[5] The Order Granting Motion to Suppress also reflected clarification requested by the State of a prior order entered on February 9, 2016.

9

or "wrong." State v. Spillner, 116 Hawai'i 351, 357, 173 P.3d 498, 504 (2007). The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the evidence sought to be excluded was unlawfully secured in violation of the Fourth Amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution. State v. Kaleohano, 99 Hawai'i 370, 375, 56 P.3d 138, 143 (2002).

The "right/wrong" standard of review also applies to the lower court's conclusions of law, which allows the appellate court to "examine the facts and answer the question without being required to give any weight to the trial court's answer to it." Id. Accordingly, a conclusion of law does not bind the court and is "freely reviewable for its correctness." State v. Bowe, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994).

However, where a conclusion of law "presents mixed questions of fact and law, it is reviewed under the clearly erroneous standard because the court's conclusions are dependant upon the facts and circumstances of each individual case." State v. Trinque, 140 Hawai'i 269, 276, 400 P.3d 470, 477 (2017) (quoting State v. Furutani, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994) (internal quotation marks and additional citations omitted)). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." State v. Okumura, 78

Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (internal quotation marks and citation omitted).

IV. DISCUSSION

A. Reasonable Suspicion

In appropriate circumstances, "[t]he police may temporarily seize or detain an individual to investigate possible criminal behavior based on reasonable suspicion, even if there is no probable cause for an arrest." State v. Dawson, 120 Hawai'i 363, 369, 205 P.3d 628, 634 (App. 2009) (citing Spillner, 116 Hawai'i at 357-58, 173 P.3d at 504-05; State v. Melear, 63 Haw. 488, 493, 630 P.2d 619, 624 (1981)). The State does not deny that a seizure occurred when Officer Arnds approached Kaianui in front of her home and began asking her about the collision.[6] Instead, the disputed issue is whether Officer Arnds possessed a "reasonable suspicion" to justify the seizure.

"The ultimate test in these situations must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate."

---

[6] A defendant is seized when, in view of the totality of the circumstances, "a reasonable person would have believed that he [or she] was not free to leave." State v. Quino, 74 Haw. 161, 169, 840 P.2d 358, 362 (1992) (quoting United States v. Mendenhall, 446 U.S. 544, 554, (1980)). The Hawai'i Supreme Court has also held that a person is seized "when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information." State v. Kearns, 75 Haw. 558, 567, 867 P.2d 903, 907 (1994). Here, the record indicates that Officer Arnds approached Kaianui at 10:45 p.m., while in uniform and after shining his patrol car's spotlight on her house, and immediately began questioning her about her possible involvement in a motor vehicle collision. He testified that he approached Kaianui because "it's our job to investigate crashes." Officer Arnds did not request Kaianui's consent to enter her property or to question her nor did Kaianui request a police response to her home or otherwise invite the police onto her property. Accordingly, we conclude that Officer Arnds seized Kaianui when he approached and questioned her.

State v. Perez, 111 Hawai'i 392, 398, 141 P.3d 1039, 1045 (2006) (quoting State v. Barnes, 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977) (internal quotation marks omitted)). The purpose of the stop is "to allow the officer to confirm or deny [his or her reasonable] suspicions by reasonable questioning, rather than forcing in each instance the 'all or nothing' choice between arrest and inaction." State v. Ah Loo, 94 Hawai'i 207, 211, 10 P.3d 728, 732 (2000) (quoting State v. Patterson, 59 Haw. 357, 363, 581 P.2d 752, 756 (1978) (internal quotation marks omitted)). However, to support the stop, law enforcement "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Barnes, 58 Haw. at 338, 568 P.2d at 1212. Ultimately, reasonable suspicion determinations are "grounded in a fact-intensive, case-by-case approach," considering the totality of the circumstances. Spillner, 116 Hawai'i at 358, 173 P.3d at 505; State v. Prendergast, 103 Hawai'i 451, 460, 83 P.3d 714, 723 (2004).

The State argues that the District Court "failed to comprehend that [Officer Arnds's] 'particularized and objective basis' for suspecting legal wrongdoing sufficed to establish reasonable suspicion." Specifically, the State contends that Officer Arnds possessed a reasonable suspicion based on the following facts known to him at the time he approached Kaianui: (1) the location of Kaianui's vehicle within the same vicinity that was communicated by dispatch; (2) the purported description of the responsible vehicle as a champagne-colored Toyota pickup

truck; and (3) a man standing next door to Kaianui's home, who reportedly pointed at her vehicle as the police pulled up to her home.

Regarding information communicated over police radio, the Hawai'i Supreme Court has held that "[w]hile police officers are acting in concert and are keeping each other informed of the progress of a particular investigation, the knowledge of each is deemed to be the knowledge of all." Barnes, 58 Haw. at 336, 568 P.2d at 1210. It is not necessary that the police officer making the reasonable suspicion determination have personal knowledge of its justification. Id. Indeed, an officer in "hot pursuit" of a suspect "has no opportunity to check on the reliability of the information he receives over the police radio, and necessarily relies on headquarters." State v. Pokini, 45 Haw. 295, 311, 367 P.2d 499, 507-08 (1961).

Here, Officer Arnds was permitted to rely on the information provided by dispatch relating to the general location of the responsible vehicle, which was in the general vicinity of Kaianui's residence. However, this information--that the responsible vehicle was in the area of Kuhio and Pohala Streets-- is not on its own sufficient to form a basis for reasonable suspicion. Nor does the State contend so. Instead, the State argues, because the color, make, and type of Kaianui's vehicle matched the description of the vehicle for which Officer Arnds was searching and because a man standing near Kaianui's house pointed at her vehicle upon Officer Arnds's arrival, this was

sufficient to establish reasonable suspicion. We address each of these purported facts in turn.

With regards to the responsible vehicle's description as a champagne-colored Toyota pickup truck, there is no testimony or other evidence in the record as to the origin of this information or how Officer Arnds learned of it. Officer Arnds testified that he did not know where that particular information came from, although he thought maybe it was from a witness statement. Felicilda's testimony was that she could not discern the color; she did not describe it as champagne-colored, did not know if it was light or dark in color, only metallic. Officer Badayos testified that he took a statement from a male witness, who appears to have been Felicilda's boyfriend, but he did not testify that he relayed any information to dispatch or anyone other than Officer Lago and offered no testimony regarding the color of the suspect vehicle. Therefore, the source of this description is unknown.

Viewing the "champagne-colored" Toyota pickup as information obtained from an unknown source, we consider the supreme court's holding that "the *reliability* of [a] tip is a predominant factor in [the] examination of the totality of the circumstances regarding the constitutionality of [an] investigative stop." Prendergast, 103 Hawai'i at 460, 83 P.3d at 723 (emphasis added). In Prendergast, the court upheld the constitutionality of a traffic stop based on a tip in which the caller (who identified himself by name), provided a contemporaneous, first-hand account of erratic driving, along

14

with the make, model, license plate number, location, and direction of the involved vehicle. Id. at 452-53, 83 P.3d at 715-16. The court recognized that the basis of the informant's knowledge was known to "clearly derive[] from personal observations." Id. at 460, 83 P.3d at 723. The court found that because the information was "firmly rooted in time and place and based on firsthand observations of criminal activity," it was sufficient in those narrow circumstances to support a finding of reasonable suspicion. Id. at 461, 83 P.3d at 724; see also State v. Goudy, 52 Haw. 497, 498, 504, 479 P.2d 800, 801, 804 (1971) (anonymous tip with specific predictions of future activity, in combination with police confirmation of that activity, was sufficient to justify temporary stop).

Conversely, when the source of the information is unknown and thus "devoid of any of the underlying circumstances which explain how the informant knew [the suspect was] committing crime," the tip cannot serve as the basis for a seizure. State v. Phillips, 67 Haw. 535, 540, 696 P.2d 346, 350 (1985). In Phillips, an anonymous caller reported that an unidentified male was threatening people while brandishing a weapon at the Lanikai Boat Ramp. Id. at 536, 696 P.2d at 348. The caller further provided the color, make, and license plate of the offender's vehicle. Id. Upon arrival at the scene, the police saw a car matching this description with the defendant sitting in the vehicle, but otherwise noted nothing out of the ordinary. Id. The officers approached the vehicle, spotted and seized a

sheathed knife sitting on the front seat, and asked the defendant to step out of the vehicle.  Id. at 536-37, 696 P.2d at 348-49.

The supreme court held that the evidence should have been suppressed because, "[w]ithout more, a faceless informer's tip does not give cause for the forcible stop of a person."  Id. at 540, 696 P.2d at 350.  Although the informant had provided a correct and specific description of the defendant's vehicle, the informant did not explain how she or he knew "that the defendant had committed or was committing a crime."  Id. at 539, 696 P.2d at 350 (emphasis added).  Furthermore, the defendant's possession of the knife in the car did not justify a further search, because mere possession of a knife is not unlawful.  Id.

Here, Officer Arnds initially testified that he approached Kaianui because the vehicle parked in front of her residence "was a gold Toyota pickup truck and had heavy front end damage."  However, he later admitted that he could not see any damage from the street; therefore, the only correlating information concerning the description of the truck was its make and color.  However, Officer Arnds did not establish how he came to know this information or at what point in the investigation he learned of the description.  While he did initially state that "we had a witness statement," he ultimately could not "recall how we got that information."  There is nothing in the record to indicate the origin of the information.  The only evidence of what witnesses said at the scene of the collision was Felicilda's testimony, and she did not identify the color of the truck, only its make.

16

The State contends that it is "wrong to require the source of the dispatch information be proven in order for the State to show that reasonable suspicion existed." The State correctly recognizes that law enforcement may rely on dispatch descriptions, even where those descriptions do not identically correspond to the suspect. Melear, 63 Haw. at 493, 630 P.2d at 624. However, in this case, the record does not establish that dispatch conveyed any description of the responsible vehicle or of its operator or any other particularized facts that would lead the police to single out Kaianui's vehicle or Kaianui herself at that point in the investigation. Thus, unlike the geographic information that *was* conveyed by dispatch in this case, the court cannot attribute the same reliability to the description of the vehicle where there is no demonstration at all of its origin.

As the supreme court recognized in Prendergast, the reliability of the information from an unknown source is paramount. 103 Hawai'i at 460, 83 P.3d at 723. Thus, without being "firmly rooted in time and place and based on firsthand observations of criminal activity," the information from an unknown source that the involved vehicle was a gold or champagne colored pickup truck does not provide additional support for Officer Arnds's reasonable suspicion that Kaianui may have been involved in criminal wrongdoing. See id. at 461, 83 P.3d at 724.

Finally, the State asserts that an unidentified neighbor's pointing at Kaianui's truck "substantially corroborat[ed] what [Officer Arnds] was dispatched to look for." However, Officer Arnds did not testify that he relied on the

pointing man to form his "reasonable suspicion" concerning Kaianui. Instead, he testified, "I don't know why he was pointing at the car at the time. No, I don't know why. He didn't say she was involved in a crash or anything like that. He just pointed at her car." Officer Arnds did not speak with the man before entering Kaianui's property and seizing her. That an unidentified man, who may have been Kaianui's neighbor, was pointing toward a car parked on a property located on one of the streets that Officer Arnds was cruising does not "substantially corroborate" a suspicion that the responsible vehicle was parked at this particular defendant's house.

Further, the cases cited by the State are readily distinguishable, as they include additional facts from which a reasonable inference can be made that the nonverbal pointing was intended to indicate criminal wrongdoing. In People v. Dickerson, for example, officers responded to a radio communication of a man with a gun in a specific restaurant. 655 N.Y.S.2d 48, 49, 238 A.D.2d 147, 148 (N.Y. App. Div. 1997). Upon arriving at the scene, a man outside the restaurant stated, "The man you're looking for is in the restaurant." Id. Upon entering the restaurant, the defendant was the only patron inside and a worker behind the counter immediately pointed to the defendant. Id. The New York appellate court upheld the conviction, concluding that the stop was constitutional and based on reasonable suspicion. Id.

Similarly in Commonwealth v. Vazquez, several individuals had described the suspect to law enforcement and

given his location on a particular street. 686 N.E.2d 993, 994 (Mass. 1997). Additional individuals pointed to the suspect who was standing near his vehicle and the officer stopped and frisked the suspect. Id. In upholding the lawfulness of the stop, the Massachusetts Supreme Court held that the information from multiple witnesses to the criminal activity in combination with the nonverbal indication of two or three additional witnesses was sufficient to form the basis for reasonable suspicion. Id. at 996.

Here, however, the unidentified man made no verbal or nonverbal accusation that Kaianui was involved in any wrongdoing. In contrast with the cases cited by the State, there is no indication in the record that he witnessed any criminal activity and the police did not obtain his statement or even his identity. Indeed, Officer Arnds did not tesify that he acted based on the man's pointing, rather he was already pulling up to Kaianui's house to conduct an investigation; nor did Officer Arnds note the pointing man in his police report. Without additional facts, the pointing man did not further support a basis for Officer Arnds to have formed a reasonable suspicion sufficient to seize Kaianui.

Thus, while the State correctly states that "collective information" communicated by police radio can serve as the basis for reasonable suspicion (even where the information is not a precise correlation to the actual suspect), the only "collective" knowledge established by the record that can be imputed to Officer Arnds was a general location of the responsible vehicle and possibly, by inference, Felicilda's general identification of

the vehicle as a Toyota pickup was relied to Officer Arnds. We conclude that the evidence in the record does not support a reasonable suspicion that "criminal activity was afoot." Perez, 111 Hawai'i at 398, 141 P.3d at 1045 (holding that facts which "[give] rise only to the inchoate suspicion that defendant might intend to engage in drug activity in the future" are insufficient to support a reasonable suspicion determination). Indeed, Kaianui exhibited no sign of injury and there was no vehicle damage visible to Officer Arnds from the street. Furthermore, and as the District Court properly recognized, "[a] truck parked outside a home in a residential neighborhood at that time of the evening raises no suspicion." Testimony that the conversation between Officer Arnds and Kaianui quickly revealed that she had been in a motor vehicle collision and that his subsequent observations revealed damage to her vehicle does not justify, after the fact, the initial seizure without reasonable suspicion. Id. at 398, 141 P.3d at 1045 ("[the] standard requires reasonable suspicion to be based on facts known to the police *at the time of the search or seizure*").

Accordingly, we reject the State's first contention of error.

B. Officer Arnds's Entry Onto Kaianui's Property

The State argues that the District Court erred in concluding that Officer Arnds needed probable cause because he entered the curtilage of Kaianui's home.

20

The United States Supreme Court recently reiterated its rule that "[w]hen a law enforcement officer physically intrudes on the curtilage *to gather evidence*, a search within the meaning of the Fourth Amendment has occurred." Collins v. Virginia, -- U.S. --, 138 S.Ct. 1663, 1670 (2018) (emphasis added) (citing Florida v. Jardines, 569 U.S. 1, 11 (2013)). This test, which the Hawai'i Supreme Court dubs the "trespass-intrusion test" relies on a property-based understanding of the Fourth Amendment doctrine. State v. Phillips, 138 Hawai'i 321, 337, 382 P.3d 133, 149 (2016). The first question under this test is whether there is a trespass or physical intrusion, which means an act of "entering without permission," to a constitutionally-protected area, *i.e.*, persons, houses, papers or effects. Id. (quoting Black's Law Dictionary 951 (10th ed. 2014)). If so, it must further be determined "whether the underlying purpose of the police, objectively examined and at the time of the trespass or physical intrusion, is to gather evidence." Id. (citing Jardines, 569 U.S. at 7-11. Once both elements are met, a constitutional "search" has occurred and the inquiry then shifts to whether the search was reasonable, as having been authorized by a warrant or an applicable exception to the warrant requirement. Id.

Alternatively, and if the trespass-intrusion test does not dictate that a search has occurred, a search may also result when the government intrudes into areas, objects, or activities in which an individual has exhibited a "reasonable expectation of

21

privacy." Phillips, 138 Hawai'i at 337 n.10, 382 P.3d at 337 n.10 ("[These tests] are alternative tests. . . . [W]here no Fourth Amendment search is found under one of the tests, the inquiry does not stop there, and the court must determine whether a search occurred under the other test."). To find that a defendant's expectation of privacy is reasonable, "there is a two-fold requirement:" (1) that the first exhibited an actual, subjective expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable. Id. at 337, 382 P.3d at 149 (citing Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

The threshold issue for either test is whether the District Court erred in concluding that Officer Arnds entered the constitutionally-protected area, or curtilage, of Kaianui's residence during his investigation. The curtilage determination is "dependent upon the facts and circumstances of [this] individual" case and therefore is a mixed question of law and fact, which we review for clear error. Trinque, 140 Hawai'i at 276, 400 P.3d at 477. A court has clearly erred when its finding lacks substantial evidence in the record to support the finding or the appellate court is left with the conviction that a mistake has been made. Okumura, 78 Hawai'i at 392, 894 P.2d at 89. Moreover, the lower court "may draw all reasonable and legitimate inferences and deductions from the evidence adduced." State v. Batson, 73 Haw. 236, 245-46, 831 P.2d 924, 930 (1992) (quoting

22

State v. Nelson, 69 Haw. 461, 469, 748 P.2d 365, 370 (1987)) (internal quotation marks omitted).

While the Fourth Amendment "does not . . . prevent all investigations conducted on private property," it affords the home a protection "first among equals." Jardines, 569 U.S. at 6. The area "immediately surrounding and associated with the home"--the curtilage--is regarded as "part of the home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984). "Curtilage is usually defined as a small piece of land, not necessarily enclosed, around a dwelling house and generally includes buildings used for domestic purposes in the conduct of family affairs." State v. Kender, 60 Haw. 301, 304, 588 P.2d 447, 449 (1978). It is "an area where the private domestic activities normally conducted within the sanctity of the home itself can be expected to extend." State v. Quiday, 141 Hawai'i 116, 126, 405 P.3d 552, 562 (2017) (citing and adopting the curtilage rationale of People v. Cook, 710 P.2d 299 (Cal. 1985)). It is the area around the home that is "'intimately linked to the home, both physically and psychologically' and is where 'privacy expectations are most heightened.'" Jardines, 569 U.S. at 7 (quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)). The "conception defining the curtilage . . . is a familiar one easily understood from our daily experience." Oliver, 466 U.S. at 182 n.12. Ultimately, curtilage is to be contrasted with areas in open fields. See United States v. Jones, 565 U.S. 400, 411 (2012) ("Quite simply, an open field, unlike the curtilage of a

23

home, is not one of those protected areas enumerated in the Fourth Amendment.").

To aid in determining where the curtilage ends and an open field begins, the Supreme Court has provided certain factors that may be applied to a particular area at issue.[7] United States v. Dunn, 480 U.S. 294(1987); but see Jardines, 569 U.S. 1, and Collins, 138 S.Ct. 1663 (finding, without application of the Dunn factors, that both the front porch and a partially enclosed driveway, respectively, were included within the curtilage). These factors, while useful, are not dispositive of the inquiry into whether an area is included in the curtilage. See, e.g., United States v. Johnson, 256 F.3d 895, 911 (9th Cir. 2001) (en banc) ("the Dunn factors do not yield a definite answer; rather they guide [us] in determining whether the area is so intimately connected to the home that it should fall under the umbrella of the Fourth Amendment's protections").

The Hawai'i Supreme Court has not specifically employed the Dunn factors to make a curtilage determination, perhaps because it did not need to engage in a detailed analysis whether a particular area is included within the curtilage. See, e.g., Kender, 60 Haw. at 304, 588 P.2d at 449 ("one's back yard may be part of one's curtilage"); Quiday, 141 Hawai'i at 124, 405 P.3d at 560 (finding that marijuana plants in defendant's backyard

---

[7]  These factors are:  (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. Dunn, 480 U.S. at 301.

were "tucked in the curtilage" of the home "directly along the west side" of the residence); State v. Jensen, 69 Haw. 534, 750 P.2d 932 (1988) (backyard in a residential area is part of a defendant's curtilage); Phillips, 138 Hawai'i at 348-50, 382 P.3d at 160-62 (interior of garage is, at a minimum, within the curtilage of the home); State v. Cuntapay, 104 Hawai'i 109, 118, 85 P.3d 634, 643 (2004) (recognizing Fourth Amendment protections for a washroom "located in the garage area"); cf. State v. Stachler, 58 Haw. 412, 418-421, 570 P.2d 1323, 1328-29 (1977) (marijuana patch located roughly fifteen feet south of the defendant's house not determined to be within the curtilage); State v. Knight, 63 Haw. 90, 93, 621 P.2d 370, 373 (1980) (greenhouse located approximately forty-five feet away from the defendant's home not shown to be within the curtilage of the residence).

The United States Supreme Court has engaged in a curtilage analysis with regard to the front porch of a residence as well as a partially-enclosed portion of a driveway. In Jardines, the Court considered whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a "search" within the meaning of the Fourth Amendment. 569 U.S. at 3. The Court found that the "front porch is the classic exemplar of an area adjacent to the home and to 'which the activity of home life extends.'" Id. at 7 (quoting Oliver, 466 U.S. at 180).

In Collins, the police viewed from the street what appeared to be a motorcycle (matching the description of one that had been reported stolen) parked on defendant's driveway. __ U.S. __, 138 S.Ct. at 1668. The officer photographed the motorcycle from the sidewalk and then walked onto the residential property and up to the top of the driveway to where the motorcycle was parked. Id. He then pulled off a tarp covering the motorcycle, ran a search of the license plate and vehicle identification numbers (which confirmed the motorcycle was stolen), took a photograph of the uncovered motorcycle, put the tarp back on, and left the property. Id.

The Court sought to apply the holding in Jardines that a law enforcement officer's physical intrusion "on the curtilage to gather evidence," constitutes a search within the meaning of the Fourth Amendment. Id. at 1670. Thus, as a threshold issue, the Court addressed whether the "part of the driveway where [defendant's] motorcycle was parked and subsequently searched is curtilage." Id. (emphasis added). The Court carefully parsed the record, which included photographs of the front of the house and driveway. Id. In concluding that the area at issue was curtilage, the Court relied on the following facts: (1) the driveway ran alongside the front lawn and up a few yards past the front perimeter of the house; (2) the top portion of the driveway sat behind the front perimeter of the house and was enclosed on two sides by a brick wall about the height of a car and on a third side by the house; (3) a side door provided direct access

26

between this partially enclosed section of the driveway and the house; and (4) a visitor seeking to reach the front door of the house would have to walk part way up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. Id. at 1670-71. The Court concluded that, similar to "the front porch [in Jardines], the side garden, or area 'outside the front window,' the driveway enclosure where [the Officer] searched the motorcycle constitutes' an area adjacent to the home and 'to which the activity of home life extends' and so is properly considered curtilage." Id. at 1671 (quoting Jardines, 569 U.S. at 6; Oliver, 466 U.S. at 182, n.12.

Here, therefore, to determine whether the District Court clearly erred in finding that Officer Arnds entered the curtilage of Kaianui's home, we must consider Officer Arnds's testimony and any reasonable inferences therefrom. Officer Arnds testified that Kaianui was out in front of her residence, that she was kind of by her garage. The house was in darkness, but the police had their headlights on and had lit up the area with their spotlight. Kaianui's vehicle was pulled up on the grassy area of her yard next to her garage and the damaged front-end of the vehicle was not visible from the street. It also was not visible to the officer from his vantage point where he seized Kaianui, as he ultimately testified that he could not see the damage to the truck until after he spoke with Kaianui and he walked further into Kaianui's property and up to the truck.

27

Based on this record, we cannot conclude that the District Court clearly erred in finding and concluding that Officer Arnds had entered the curtilage when he approached Kaianui in front of her residence or when he observed the damage to Kaianui's vehicle. It is a reasonable inference from the testimony that the area where Kaianui was standing directly borders the home itself and that Officer Arnds had to further encroach into a nearby area on Kaianui's property, which was not visible without that further encroachment, in order to inspect the vehicle. The record is sparse; however, the evidence and reasonable inferences therefrom support the District Court's conclusion that Officer Arnds entered the curtilage.

Accordingly, our inquiry shifts to whether this entry was accomplished through an "intrusion" (i.e., entry without permission) and "whether the underlying purpose . . . objectively examined and at the time of the trespass or physical intrusion, is to gather evidence." Phillips, 138 Hawai'i at 337, 382 P.3d at 149.

It is undisputed that Officer Arnds never requested Kaianui's express permission to enter onto her property. Additionally, there is no evidence indicating her implied permission to do so. The Supreme Court recognizes an implied license that permits a "visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Jardines, 569 U.S. at 8. Here, however, Officer Arnds testified that he approached

28

Kaianui, immediately began questioning her about her involvement in a motor vehicle collision, and further entered and lingered on her property to inspect her vehicle, all without her consent to do so. The record therefore supports the conclusion that Officer Arnds entered the curtilage intrusively and without permission.

The record also supports the District Court's mixed finding and conclusion that Officer Arnds entered Kaianui's property with the purpose of investigating and gathering evidence of a crime.[8] Specifically, when asked why he thought it was necessary to immediately approach Kaianui, he responded, in part: "[I]t's our job to investigate crashes. . . . [M]y investigation of the crash was to go there, find the operator, for get her statement, and make sure, again, . . . that she wouldn't -- didn't have serious injuries." The court recognizes Officer Arnds's additional motivation of ensuring that a potentially-injured motorist receive the necessary medical treatment; however, we cannot conclude that the District Court clearly erred in finding and concluding that Officer Arnds entered Kaianui's property in order to gather evidence relevant to his investigation.

Accordingly, we conclude that the District Court did not err in concluding that Officer Arnds effected a search when he entered the curtilage of Kaianui's residence.

_____

[8] Namely, Kaianui's alleged violations of HRS §§ 291E-61(a)(1)(3), 291C-15, HRS § 291-12, 291-2.

Thus, we turn to whether the search was reasonable. A warrantless search, while presumptively unreasonable, may be justified where the search was supported by probable cause and exigent circumstances. See Phillips, 138 Hawai'i at 336, 382 P.3d at 148; State v. Meyer, 78 Hawai'i 308, 313, 893 P.2d 159, 163 (1995) (citing State v. Ritte, 68 Haw. 253, 257, 710 P.2d 1197, 1201 (1985)).

Probable cause exists when "the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed." State v. Navas, 81 Hawai'i 113, 116, 913 P.2d 39, 42 (1996). The District Court determined that Officer Arnds "lacked . . . probable cause to enter the curtilage to effect a search." We agree.

As stated above, Officer Arnds's testimony fails to establish a sufficient basis for having singled out Kaianui and her vehicle as potentially responsible for the motor vehicle collision. Having failed to establish even a reasonable suspicion to support Officer Arnds entry onto Kaianui's property, it necessarily follows that the record also fails to establish sufficient probable cause to enter the property. See, e.g., Perez, 111 Hawai'i at 398, 141 P.3d at 1045 (acknowledging reasonable suspicion as a standard lower than probable cause).

The argument that Officer Arnds's questioning of Kaianui provided the probable cause to further enter onto her

30

property and inspect her vehicle is without merit. As we concluded above, Officer Arnds engaged in an improper seizure of Kaianui when he questioned her about her purported involvement in the collision. The probable cause for a subsequent search cannot therefore be based on her responses to such questioning. Without those responses, or assuming for argument's sake that Kaianui had not been present at all, the remaining facts do not provide a sufficient basis to justify Officer Arnds's entry onto Kaianui's property without a warrant. Accordingly, we need not address the State's argument that exigent circumstances justified the warrantless search.

V.    CONCLUSION

For these reasons, the District Court's March 4, 2016 Order Granting Motion to Suppress is affirmed.

DATED: Honolulu, Hawai'i, October 31, 2018.

On the briefs:

Renee Ishikawa Delizo,
Deputy Prosecuting Attorney,
County of Maui,
for Plaintiff-Appellant.

David A. Sereno,
for Defendant-Appellee.

Presiding Judge

Associate Judge

Associate Judge